1  GEORGE A. RILEY (State Bar No. 118304)
   DANIEL H. BOOKIN (State Bar No. 78996)
2  ROBERT D. TRONNES (State Bar No. 209835)
   VIVI N. TRAN (State Bar No. 247513)
3  O'MELVENY & MYERS LLP
   Two Embarcadero Center
4  28th Floor
   San Francisco, California  94111-3828
5  Telephone:   (415) 984-8700
   Facsimile:   (415) 984-8701
6  E-Mail:       griley@omm.com
                 dbookin@omm.com
7                rtronnes@omm.com
                 vtran@omm.com
8
   Attorneys for Nominal Defendant APPLE INC.
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

                    SAN JOSE DIVISION
12

13  In re APPLE INC.                    Master File No. C-06-04128-JF
    DERIVATIVE LITIGATION
                                        **EXHIBIT 1 TO THE DECLARATION OF**
14                                      **ROBERT D. TRONNES IN SUPPORT OF**
                                        **NOMINAL DEFENDANT APPLE INC.'S**
15  This Documents Relates to:          **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES IN SUPPORT OF FINAL**
        ALL ACTIONS.                    **APPROVAL OF DERIVATIVE**
16                                      **SETTLEMENT**

17                                      **MANUAL FILING NOTIFICATION**

18
                                        Department:   Ctrm. 3, 5th Floor
19                                      Judge:         Honorable Jeremy Fogel

20

21              **MANUAL FILING NOTIFICATION**

22       **EXHIBIT 1** to the **DECLARATION OF ROBERT D. TRONNES**

23            Portions of this filing are in paper or physical form only, and are being maintained in the

24  case file in the Clerk's office.  If you are a participant on this case, this filing will be served in

25  hardcopy shortly.  For information on retrieving this filing directly from the court, please see the

26  court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

27

28

                              1

1    This filing was not efiled for the following reason(s):

2    ___ Voluminous Document (PDF file size larger than efiling system allowances)

3    ___ Unable to Scan Documents

4    ___ Physical Object (description): _____

5    _____

6    ___ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

7    _X_ Item Under Seal

8    ___ Conformance with the Judicial Conference Privacy Policy (General Order 53).

9    ___ Other (description): _____

10   _____

11

12   Dated:  October 23, 2008                    O'MELVENY & MYERS LLP
                                                  GEORGE A. RILEY (State Bar No. 118304)
13                                                DANIEL H. BOOKIN (State Bar No. 78996)
                                                  ROBERT D. TRONNES (State Bar No. 209835)
14                                                VIVI N. TRAN (State Bar No. 247513)

15
                                                  By:_____/s/ Robert D. Tronnes_____
16                                                          Robert D. Tronnes

17                                                Attorneys for Nominal Defendant APPLE INC.

18

19   MP1:1027460.2

20

21

22

23

24

25

26

27

28

1   Joseph J. Tabacco, Jr. (75484)
    Email: jtabacco@bermanesq.com
2   Nicole Lavallee (165755)
    Email: nlavallee@bermanesq.com
3   James Magid (233043)
    jmagid@bermanesq.com
4   **BERMAN DEVALERIO PEASE TABACCO**
    **BURT & PUCILLO**
5   425 California Street, Suite 2100
    San Francisco, CA  94104-2205
6   Telephone: (415) 433-3200
    Facsimile:  (415) 433-6382
7
8   H. Adam Prussin
    Email: HAPrussin@Pomlaw.Com
9   **POMERANTZ HAUDEK BLOCK**
    **  GROSSMAN & GROSS, LLP**
10  100 Park Avenue, 26th Floor
    New York, N.Y. 10017-5516
11  Telephone:  (212) 661-1100
    Facsimile:: (212) 661-8665
12
    **Attorneys for Plaintiff**
13
                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
14
                    **COUNTY OF SANTA CLARA**
15

16  _____
                                     )
    BOSTON RETIREMENT BOARD, fiduciary )   Case No. 108CV110403
17  of the STATE-BOSTON RETIREMENT    )
    SYSTEM,                           )   **REDACTED AMENDED SHAREHOLDER**
18                                    )   **DERIVATIVE COMPLAINT**
                    Plaintiff,        )
19                                    )   JURY TRIAL DEMANDED
                                      )
20          vs.                       )
                                      )
21  STEVEN P. JOBS, WILLIAM V.        )
    CAMPBELL, MILLARD DREXLER,        )
22  ARTHUR D. LEVINSON, JEROME B.     )
    YORK, GARETH C.C. CHANG, EDGAR S. )
23  WOLLARD, FRED D. ANDERSON, AND    )
    NANCY R. HEINEN,                  )
24                                    )
                    Defendants,       )
25                                    )
            and                       )
26                                    )
    APPLE, INC.,                      )
27                                    )
                    Nominal Defendant. )
28  _____)

                        - 1 -
    [108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, derivatively on behalf of Apple, Inc. ("Apple" or the "Company"), alleges the following based upon the investigation of plaintiff's counsel, including the documents produced by Apple pursuant to an order of this Court in a document inspection proceeding pursuant to § 1601 et seq. of the California Corporations Code, together with a review of relevant legal and regulatory filings, press releases and media reports.

# I. BACKGROUND OF THESE PROCEEDINGS

1.      Plaintiff brings this shareholder derivative action on behalf of nominal defendant Apple, a California corporation, against certain present and former members of Apple's Board of Directors and certain senior executives for breaches of fiduciary duty, unjust enrichment, and corporate waste.

2.      During the period 1997-2002, Apple issued stock options to officers and employees of the Company pursuant to three separate stock option plans. Each plan required that the exercise price of all options issued pursuant to the plans be set at the price for Apple's shares at the close of trading on the day the options were actually approved by the directors of Apple.

3.      During that period, accounting rules allowed companies to issue options without recognizing the value of the options as an expense, provided that the exercise price of the options was at or above the market price of the underlying stock on the date the options were granted. Backdating enables the company to issue "in the money" stock options, at exercise prices lower than the current price of the stock, while avoiding the recognition of the expense.

4.      On June 29, 2006, in response to published studies showing massive backdating of options throughout corporate America, Apple announced that it had discovered irregularities related to option grants issued between 1997 and 2001. It also announced that it had appointed a "special committee" of directors to pursue this investigation. It later became known that non-defendant director Albert A. Gore, Jr. ("Gore") and defendant Jerome B. York were the original members of that committee. Apparently concerned about York's lack of independence – he had, after all, personally approved thousands of backdated options grants – in late August a third director, non-defendant director Dr. Eric Schmidt ("Schmidt") was appointed as a third member of this committee. Both Schmidt and Gore had become directors well after backdating had ended.

- 2 -

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

5.      On August 3, 2006, the Company announced that it had discovered "additional irregularities" and that it would probably have to restate its earnings for 2003-2005.

6.      On October 4, 2006, Apple issued a press release announcing that its internal investigation had been completed. It did not release the report itself, but purported to summarize the key findings as follows:

> The investigation found no misconduct by any member of Apple's current management team…. Stock option grants made on 15 dates between 1997 and 2002 appear to have grant dates that precede the approval of those grants. In a few instances, Apple CEO Steve Jobs was aware that favorable grant dates had been selected, but he did not receive or otherwise benefit from these grants and was unaware of the accounting implications.

> The investigation raised serious concerns regarding the actions of two former officers….

> The company also announced that Fred Anderson, Apple's former CFO, has resigned from its board of directors. Mr. Anderson, who served as CFO from 1996 until 2004, informed the company that he believes it is in Apple's best interests that he resigns from the board at this time.

7.      Later press reports said that Apple was focusing on two former employees as the primary wrongdoers based on Apple's internal investigation.  Those two individuals are Apple's former chief financial officer/director, Fred D. Anderson, and Nancy R. Heinen, Apple's former general counsel.  Heinen had resigned in May 2006, without explanation.

8.      On December 29, 2006, Apple issued another press release that coincided with the release of its annual 10-K report. The release announced yet again that the committee's investigation had been completed and that, as a result, the Company's financial statements for 2002, 2003, 2004 and 2005 would be restated to recognize a total of $105 million in previously unreported employee expense related to the backdated options. The Company now admitted that 42 options grants, involving over 6,700 separate option awards, had been dated improperly during the period 1997-2002.

9.      Although the Company once again did not release the committee's report, the annual report purported to summarize the findings of the committee.  First and foremost, the annual report repeated that the investigation had cleared all members of current management.  Then it stated that:

> The terms of these and certain other grants … were finalized after the originally assigned grant dates.  The Special Committee concluded that the procedures for

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

granting, accounting for, and reporting stock option grants did not include sufficient safeguards to prevent manipulation.

10.     The press release accompanying the Company's 10-K, issued in December of 2006, said that

> Although the investigation found that CEO Steve Jobs was aware of and recommended the selection of some favorable grant dates, he did not receive or financially benefit from these grants or appreciate the accounting implications....

The Company has gone to great lengths to obfuscate Jobs' exact role in the backdating scheme. Although it was forced to admit that Jobs was "aware of" backdating and "recommended" certain grant dates, this was as far as it was willing to go in explaining Jobs' exact role.

11.     The Company's vague and shifting uses of the phrases "finalized," "materialized," and "approved," and of its cryptic allusion, almost in passing, of Jobs' "awareness" of and "recommendations" concerning option grant dates, are obfuscations. As a January 13, 2007, New York Times article concluded:

> [T]he disclosures made to the investing public, including the special committee report, have been too cute by half, a series of grudging admissions that don't give anything close to the whole picture.

12.     Rather than blame Jobs and/or other members of current management, Apple has tried to shift all the blame to two former employees, former CFO Fred D. Anderson and former general counsel Nancy. R. Heinen, both of whom had abruptly resigned, and both of whom have been sued by the SEC in connection with their participation in the backdating scheme.

13.     Although these two undoubtedly did participate in the scheme, the notion that they alone are solely to blame for five years of backdated options, each of which was approved by the directors of the company, is not credible. These directors must stand up and take responsibility for their own intention conduct, and their own failure to establish procedures that would have prevented this from happening. Yet Apple's Special Committee has taken no action against the directors who voted to approve these backdated options. Aside from Heinen and Anderson, who quit, no one has been fired as a result of this widespread wrongdoing, and the Company has taken no action to re-price its options to reflect the dates they were actually granted, or to prevent anyone from exercising options at backdated prices.

- 4 -

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

14.     These events have precipitated a flood of litigation.  A number of shareholder class actions were filed in the U.S. District Court for the Northern District of California, where they have been consolidated under the caption In re Apple, Inc. Shareholders Litigation. Those actions have been dismissed for failure to state a claim, and an amended complaint was filed in December 2007. A number of derivative actions were also filed in that court, consolidated under the caption In re Apple Computer Inc., Derivative Litigation.  Those actions have been dismissed as well; and there, too, an amended complaint was filed in December 2007, and a new motion to dismiss this new complaint was filed in January 2008.

15.     Meanwhile, several derivative actions were filed in Santa Clara County Superior Court. Those actions have been stayed pending resolution of the federal actions.

16.     On October 4, 2006, plaintiff Boston Retirement Board, as fiduciary to the State-Boston Retirement System, served on Apple a demand under § 1601 of the California Corporations Code and under California common law, to inspect the books and records of Apple concerning its options backdating.  When the Company refused, on November 3, 2006, plaintiff filed a petition in Santa Clara Superior Court against Apple to enforce its inspection rights (the "Books and Records Proceeding").  The Company filed a demurrer to the petition, which the Court overruled.

17.     A "special litigation committee" of Apple, which had been formed in June 2007, and which consists of Dr. Eric Schmidt and Albert W. Gore, Jr.  ("Gore"), then intervened in the proceeding and moved to stay the action pending its own investigation into backdating.  It sought this relief even though these same two directors, together with defendant York,  were the members of the "Special Committee" that had investigated this matter during the latter part of 2006, and had finished their investigation by December, 2006.

18.     The Court denied the SLC's stay motion and the case went to trial in September 2007. At the conclusion of the trial, the Court entered a judgment requiring Apple to produce all board and committee minutes, and accounting records, relating to options (Ex. 1).  Apple has since produced some documents in compliance with that judgment.

19.     The documents Apple has produced provide critical details concerning Apple's backdating practices and, as discussed below, confirm that all of Apple's directors were aware of, and

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   participated in, the backdating scheme, and that they all abdicated their fiduciary duty to assure that

2   appropriate financial control were in place, and were operating effectively, to assure that options were

3   granted consistently with the plans and were accounted for in accordance with Generally Accepted

4   Accounting Principles.

5   **II.      JURISDICTION**

6          20.      This court has jurisdiction over all causes of action asserted herein pursuant to the

7   California Constitution, Article VI, §10, because this case is a cause not given by statute to other

8   trial courts, as this derivative action is brought pursuant to §800 of the California Corporations

9   Code to remedy defendants' violations of law.

10         21.      This Court retains general jurisdiction over each named defendant who is a resident

11  of California.  Additionally, this Court has specific jurisdiction over each named non-resident

12  defendant because these defendants maintain sufficient minimum contacts with California to render

13  jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14  Apple is headquartered in California, and because the allegations contained herein are brought

15  derivatively on behalf of Apple, defendants' conduct was purposefully directed at California.

16  Finally, exercising jurisdiction over any non-resident defendants is reasonable under these

17  circumstances.

18         22.      Venue is proper in this Court because one or more of the defendants either resides in

19  or maintains executive offices in this County, a substantial portion of the transactions and wrongs

20  complained of herein, including the defendants' primary participation in the wrongful acts detailed

21  herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Apple

22  occurred in this County, and defendants have received substantial compensation in this County by

23  doing business here and engaging in numerous activities that had an effect in this County.

24  **III.     PARTIES**

25         **A.      Plaintiff**

26         23.      Plaintiff Boston Retirement Board, fiduciary to the State-Boston Retirement System,

27  brings this action derivatively on behalf of Apple.  It owns about 58,000 shares of Apple common

28

- 6 -
[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   stock and has owned Apple stock continuously since during the period of wrongdoing described

2   herein.

3       24.     Plaintiff will adequately and fairly represent the interests of the Company and its

4   shareholders in enforcing and prosecuting its rights.

5       **B.    Defendants**

6       25.     Nominal Defendant Apple, Inc. is a California corporation with headquarters at 1

7   Infinite Loop, Cupertino, California 95014.  Apple designs, develops, manufactures, and markets

8   personal computers, portable digital music players and related products.

9       **1.    The Current Director Defendants**

10      26.     Defendant William V. Campbell ("Campbell") has been a director of Apple since

11  August 1997.  He has also been a member of the Audit and Finance Committee of the Board of

12  Directors (the "Audit Committee") since August 1997, and a member of the Compensation Committee

13  of the Board of Directors (the "Compensation Committee") since August 2001.  Campbell resides in

14  California.

15      27.     Defendant Jerome B. York ("York") has also been a director of Apple since August

16  1997.  York was also a member of the Compensation Committee during the period August 2001-

17  November 2002, and has been a member of the Audit Committee since August 1997.  York, along

18  with non-defendant director Albert A. Gore, Jr., constituted the "Special Committee" that investigated

19  options backdating at Apple, and was also appointed to the "Special Litigation Committee" in 2007 to

20  address the various pending shareholder actions.   On information and belief, York resides in

21  Michigan.

22      28.     Defendant Millard Drexler ("Drexler") has been a director of Apple since 1999.  He

23  has also been a member of the Compensation Committee since November 2002.  On information and

24  belief, Drexler resides in New York.

25      29.     Defendant Arthur D. Levinson ("Levinson") has been a director of Apple since fiscal

26  year 2000.  Levinson was also a member of the Compensation Committee during the period August

27  2001 through fiscal year 2003, and has been a member of the Audit Committee since fiscal year 2000.

28  Levinson resides in California.

- 7 -

30.     Campbell, Drexler, Levinson and York, together with Jobs, constitute 5 of the current 7-member board of directors of Apple.  The other two (Gore and Schmidt) are not defendants because they were not involved in the misconduct alleged herein.

**2.      Former Director Defendants**

31.     Defendant Gareth C.C. Chang ("Chang") was a member of the board and of the Compensation Committee from July 1997, when backdating apparently began, until April 2000, when the Compensation Committee stopped meeting.  As a member of the Compensation Committee, Chang intentionally approved a series of backdated options.

32.     Defendant Edgar S. Woolard ("Woolard") was a member of the board and of the Compensation Committee from July 1997 to April 2000, when the Compensation Committee stopped meeting. As a member of the Compensation Committee, Woolard intentionally approved a series of backdated options.

**3.      CEO/Director Steven Jobs**

33.     Defendant Steven P. Jobs ("Jobs") was co-founder of the Company but had left the company in the 1980s.  Then, in the mid-1990s, when Apple was floundering and teetered on the brink of bankruptcy, it turned again to Jobs.  He returned to the company as a consultant in late 1996, but by July 9, 1997, he had forced the resignation of Apple's CEO and most of the board. He brought in two close business associates, Campbell and York, to join the board with him in August 1997, and the following month accepted the position of "interim" CEO.  He became the permanent CEO in 2000.  Jobs resides in California.  He is sued herein in both his capacities as officer and director of the Company.

34.     Jobs' second coming to Apple has seen a dramatic turnaround at the Company, to such an extent that Jobs has now vaulted into legendary status in Silicon Valley.  Under his leadership, Apple has introduced the iPod, the iMac, and the iPhone, and has turned itself into the leading computer and consumer electronic products company in the world.

35.     Unfortunately, Jobs brought with him the nasty habit of options backdating, which was also prevalent at The GAP and Pixar, where Jobs has also been a director.

- 8 -

1    **4.      Officer Defendants**

2        36.      Defendant Fred D. Anderson ("Anderson") was the Company's Executive Vice

3    President and Chief Financial Officer from April 1996 to June 2004.  Anderson was a licensed

4    Certified Public Accountant in the State of California from 1975 to 1998.  From at least September

5    1997 until June 2004, Anderson reported directly to Jobs.  After retiring as an Apple officer, Anderson

6    became an Apple director, a position he held until his resignation in September 2006.  In April 2007

7    Anderson was sued, along with Nancy Heinen, by the SEC for securities fraud based upon their

8    participation in the options backdating scheme.  Anderson settled immediately with the SEC,

9    disgorging $3.5 million in fruits of the wrongful scheme. Anderson resides in California.

10       37.      Defendant Nancy R. Heinen ("Heinen") was the Senior Vice President, General

11   Counsel, and Corporate Secretary at Apple from 1997 until May 1, 2006, when she suddenly left the

12   Company without explanation.  As General Counsel for Apple, Heinen reviewed all company

13   financial statements, press releases and/or other filings with the SEC.  As General Counsel and

14   Corporate Secretary, Heinen had responsibility for overseeing Apple's legal group and preparing and

15   certifying the minutes of Apple's Board of Directors and its committees, including actions taken by

16   the Board and the Compensation Committee with respect to stock option grants.  Heinen has been

17   sued by the SEC for securities fraud with respect to her direct participation in backdated options at

18   Apple, including the preparation of falsified Board minutes relating to at least two backdated option

19   grants in 2001.  Heinen resides in California.

20   **IV.     FACTUAL ALLEGATIONS**

21       **A.      Apple's Stock Option Plans**

22       38.      Between 1997 and 2002, Apple granted stock options to its officers and employees

23   pursuant to three different stock option plans (the "Plans"): the 1990 Stock Option Plan (the "1990

24   Plan"), effective until March 1998; the 1997 Employee Stock Option Plan (the "1997 Plan"),

25   approved in August, 1997; and the 1998 Executive Officer Stock Plan (the "1998 Plan"), effective as

26   of April, 1998.

27       39.      Pursuant to the Plans, the "Administrator" was Apple's Board of Directors or any

28   committee appointed by the Board to administer the Plans. During the period August 1997 through

- 9 -

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   April 2000, the Administrator of the Plans was the Compensation Committee, consisting at the time of
2   defendants Chang and Woolard; from April 2000 through July 2001, the entire board acted as
3   Administrator; and from August 2001 onward, the Administrator was once again the Compensation
4   Committee, consisting at that point of defendants Campbell, Levinson and York.

5        40.     Under the Plans, the Administrator has the authority to select the specific employees to
6   whom awards would be granted, the type and amount of the award to be granted to each, and the terms
7   of the options, including the exercise price and date of grant. See, e.g., 1990 Plan ¶ 4; 1997 Plan ¶ 4;
8   1998 Plan ¶ 4.  In practice, however, management would propose specific options grants and the
9   Administrator would act on that proposal.

10        41.     The Plans limit the Administrator's discretion in setting the exercise price of the grants.
11  The 1990 and 1997 Plans required that the exercise price for any stock option issued under the Plan
12  must be at least 100% of the "Fair Market Value of the Common Stock" on the date of the grant. The
13  1998 Plan contained this 100% requirement and also provided that the exercise price of an incentive
14  stock option granted to a 10% shareholder may not be less than 110% of the "Fair Market Value" of
15  the common stock on the date such option is granted.  Although the 1998 Plan also allowed the
16  Administrator to set the exercise price below Fair Market Value under some circumstances, the
17  minutes do not show that this power was ever exercised during the relevant period. All the Plans
18  defined "Fair Market Value" to mean the closing sales price of a share of Apple common stock on the
19  date of the grant.

20        42.     For all three Plans, the date of the option grant was defined as "the date on which the
21  Administrator makes the determination granting such award, or such other later date as is determined
22  by the Administrator." None of the Plans permitted the Administrator to establish a grant date earlier
23  than the determination date.

24        43.     During the period 1997-2002, applicable accounting rules required that companies
25  recognize an expense when issuing stock options only if those options were "in the money" when
26  granted, i.e., only if the exercise price for the option was lower than the price of the underlying stock
27  at the time the option was granted.  If the exercise price of the option was set at the market price as of
28  the date of the option grant, no expense needed to be recognized.  It was therefore critical for Apple,

1  like all other public companies with stock option plans, to have financial controls in place to assure

2  that options were actually approved, in accordance with applicable corporate procedures, on the date

3  the company used to set the exercise price.

4       44.    Apple had no such procedures or financial controls in place.  Indeed, as noted above,

5  Apple has itself conceded, in its annual report issued in December 2006, that the Special Committee

6  had determined that "the procedures for granting, accounting for, and reporting stock option grants did

7  not include sufficient safeguards to prevent manipulation." For example, the 1996 10K recounts that,

8  although the grants were supposed to be dated as of the date the board or the Compensation

9  Committee actually approved them, "for many grants, however, the dates of ratification cannot be

10  established because the dates the UWCs were executed by the Board or Compensation Committee

11  members or received by the Company are not available".  Tellingly, this Special Committee included

12  York, who was a member of the Board during the period when all of these improperly dated options

13  were granted, and who must therefore share the blame for the complete absence of such controls.

14       45.    The absence of controls is also reflected in the minutes produced to plaintiff by Apple

15  in response to the Court's judgment in the Books and Records Proceeding. ████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████

22  **B.**    **The Improper Options Grants**

23       46.    By the end of December, 2006, Apple had confessed that on 42 separate occasions it

24  had issued a total of 6,428 misdated options, but it has never publicly identified them, except for the

25  Jobs grant of December 2001 – which it claims caused no injury because those options were never

26  exercised.

27       47.    ████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**1.    Grants Issued by Chang and Woolard, 1997-June 2000**

49.    With the single exception of Jobs' mammoth 10 million options ostensibly awarded in January 2000 (which was approved by the entire board), during the period 1997 through April 2000 the board delegated to the Compensation Committee, consisting of Chang and Woolard, sole authority to act as Administrator under the various Plans. ███████████████████████ the board made no effort to supervise or review the actions of the Committee, or to establish financial or other controls or procedures to assure itself that the Committee's actions were proper under the Plans and that the Company properly accounted for these grants. As a result, the Compensation Committee was able to, and did, engage in rampant and blatant options backdating on a continuing basis.

50.

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



51.

52.

53.

- 14 -



54.

55.

56.

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

58.

59.

60.

61.

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



62.

63.

64.

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████

4    69.  ████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████

7    70.  ████████████████████████████████████████

8    71.  ████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████

13   72.  ████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20   73.  ████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████

24   74.    **Grant of 10 Million Options to Jobs Purportedly Issued "Effective As Of"**

25 **January 12, 2000**.  On January 19, 2000, Apple announced that a "special compensation committee"

26 had granted 10 million options to Steve Jobs.  Defendant York stated in the Company's press release

27 issued that day that Jobs' options were "granted a week ago at the then-market price, and will gain

28 value only as Apple's stock price rises, to the benefit of all shareholders."  In fact, the Committee did

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   not approve this option grant until January 18, ████████████████████████████

2   ██████████████████████████████████████████████████████████████████████

3   ██████████████

4         75.    Apple's share price had fallen 22% in the nine days before January 12, and Apple's

5   stock price on January 12, 2000, $87.19, turned out to be the lowest trading price for the entire

6   quarter. On January 13 an upgrade by a Morgan Stanley analyst boosted the stock to $96.75, and by

7   January 18, 2000 the stock had closed at $103.94.  The difference in price was $16.75 between

8   January 12 and January 18 which, when multiplied by 10 million options, was $167.5 million.

9         76.    Apple's 10-K of December 2006 states that:

10       With respect to the grant dated January 12, 2000, the Committee … finalized the terms
11       of the grant on January 12, 2000, although the Committee's action was memorialized …
         on January 18, 2000.  Because the measurement date is the originally assigned grant
12       date, the Company has not determined that [the option was backdated].

13         77.    ████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████

20         78.    Campbell and Woolard both knew that they had not executed the consents on January

21   12 but, rather, on January 18; and the rest of the board, including Jobs, Levinson, Drexler and Chang,

22   while aware of the discrepancy between the claimed grant date and the "memorialization" date, either

23   knew the true facts or did not want to know, doing nothing to investigate despite the huge sums of

24   money involved.

25         79.    The Company continues to maintain that this option was not backdated and has not

26   taken any charge to earnings with respect to it. It also maintains that the whole matter is moot because

27   Jobs never exercised these options. However, he did not simply cancel these options; he eventually

28

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  exchanged them, along with his additional 7.5 million options granted in December, 2001, for

2  restricted stock worth billions.

3          80.    █████████████████████████████████████████████

4  █████████████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████████████

6  █████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8          81.    █████████████████████████████████████████████

9  █████████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████████

12 ████████████████████████████████

13 ████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ██████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**2.    April 2000-August 2001: The Board Picks Up Where Chang and Woolard Left Off**

82.    During the period April 2000- August 2001 the board as a whole acted as Administrator of the Plans, and approved various backdated option grants. The board knew that at least some of these option grants, including the "team grant" of January 17, 2001, were backdated. ████████████████████████████████████████████ The board also knew that it had done nothing to assure itself that financial controls were in place that would prevent backdating and assure that option grants were properly accounted for.

83.    ████████████████████████████████████

84.    ████████████████████████████████████

85.    ████████████████████████████████████

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

- 22 -

86. ███████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████

87.    **The "Team Grant" Purportedly Issued on January 17, 2001**.  The massive "team grant" of 4.55 million options to the senior management team (Anderson, Cook, Rubinstein, Tevanian, Heinen and Tamaddon) under the 1998 Plan was approved by the full board of directors of Apple, ███

████████████████████████████  The exercise price, based on the closing price that day, was $16.81.[4]

88.    Apple now concedes that this option was not actually granted until February 7, 2001, when the decision was made by the Board and the UWCs approving the grant were executed and delivered to Apple.  The closing price was $20.75 on the actual date of the grant (Ex. 2).  As a result, the Executive Team options were in-the-money by approximately $3.94 per share when they were actually granted.

89.    When the Board members all signed, on February 7, UWC's that were dated January 17, they deliberately backdated the option grant.  There could be only one purpose of signing consents on February 7 that were dated January 17: to backdate the grants so that the exercise price of the options could be lowered improperly, in violation of the terms of the plan.

90.    In April of 1997, when he settled the claims the SEC had brought against him, Anderson released a statement alleging that he advised Jobs of the potential financial consequences of backdating the Team Grant.

91.    The team grant went to six executives: Anderson, Heinen, Cook, Rubinstein, Tevanian, and Tamaddon.  Anderson exercised and sold 750,000 of the 1,000,000 shares granted to him before

---

[4] The grant was originally for 4.8 million shares, but some were later forfeited.

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    he retired from Apple in 2004.  Heinen exercised and sold all 400,000 options she received.  At a

2    minimum, Heinen and Anderson reaped improper benefits of approximately $1.6 million and $3

3    million, respectively.

4         92.    ████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████

8    ████████████████

9         93.    ████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████

12   ████████████████████████████████████

13        94.    ████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████

16   ██████████████████████████████.

17        95.    ████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████

22        96.    **Grant of 7.5 Million Options to Jobs Purportedly Issued on October 19, 2001**.

23   This grant, of 7.5 million options to CEO Steven Jobs, was purportedly approved by the board of

24   directors on October 19, 2001 ████████████████████████████████████████

25   ████████████████████████████████████████████████████████ The exercise

26   price, based on the closing price that day, was $18.30.

27

28

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

97.     Apple has subsequently admitted that those minutes *were fabricated* and that the board did not even meet, much less approve the option on that date.  Apple stated in its 10-K of December, 2006:

> The grant dated October 19, 2001 was originally approved at a Board meeting on August 29, 2001, with an exercise price of $17.83.  The terms of the grant, however, were not finalized until December 18, 2001.  The grant was dated October 19, 2001, with an exercise price of $18.30.  The approval for the grant was improperly recorded as occurring at a special Board meeting on October 19, 2001.  Such a special Board meeting did not occur....

98.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████

99.     When the option was actually granted, on December 18, 2001, Apple's stock closed at $21.02; but on October 18 the market price had been $18.30, almost $3 per share lower.  The backdating of the option by three months therefore caused the exercise price of these 7.5 million options to be underpriced by over $20 million, as Apple admitted in its December 2006 10-K:

> The Company has recognized $20 million in stock-based compensation expense for this grant, reflecting the difference between the exercise price of $18.30 and the share price on December 18, 2001 of $21.01.

100.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

101.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

102.     ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

103.     The SEC complaint alleges that on December 17, 2001, Heinen forwarded a spreadsheet to the chair of Apple's Compensation Committee, defendant Levinson, detailing three months of Apple's closing prices and recommending the selection of a day for the backdated options grant.  The complaint quotes Heinen's message to Levinson:

> There are several days in October and November, following the first meeting of the Compensation Committee on October 16th and after our earnings call on October 17th, that are close to the Aug. 29th close of $17.83.  I suggest using a day that the Compensation Committee held a telephone call, either jointly or individually with the members.

104.     This communication removes any doubt that Levinson was well aware of the Apple backdating scheme and participated directly and willingly in it.

105.     Apple has taken the position that because the options granted to Jobs were later cancelled, there has been no harm to the Company, and therefore no foul.  Thus, according to Apple's 2003 Proxy Statement (p. 10):

> In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a director.  Mr. Jobs felt strongly that this would more effectively build shareholder value by reducing the Company's overhang and by providing additional shares that could later be granted to employees whose contributions are critical to the long-term success of the Company.  In keeping with its philosophy to relate compensation to building shareholder value, in exchange for his cancelled options, the Board approved a new retention and incentive program in the form of longterm equity compensation consisting of five million restricted shares of the Company's Common Stock which generally vest in full on the third anniversary of the grant date.

106.     Since Jobs was allowed by the Board to exchange his backdated options for 10 million split-adjusted shares of stock, he did, in fact, obtain a financial benefit from the backdated options to the extent to which the number of shares into which the options were exchanged were based upon the value of the options.

107.     When the restrictions on Jobs' new shares lapsed three years later, on March 19, 2006, they were worth approximately $640 million. According to a Bloomberg report, entitled "Apple's Jobs Should Give Back the $85 Million," Jobs unjustly benefitted from the exchange of his backdated options by $85 million, utilizing the stock prices as of March 19, 2006.  Of course, the value of his ill-gotten shares is much higher today based on Apple's present stock prices.  The 2003 Proxy Statement

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  failed to disclose that the exchange of Jobs' options for stock was based on the inflated value of his

2  backdated options.

3    **3.    December 2001-April 2002: The New Compensation Committee Continues the Options Backdating Scheme**

4

5    108.    As of August of 2001 a new Compensation Committee, consisting of defendant

6  directors Campbell, York and Levinson, was established and designated to act as Administrator of the

7  Plans. From that point on, until at least the spring of 2002, backdating continued on a regular basis.

8  The Compensation Committee members, and the rest of the members of the board, knew that at least

9  some of these option grants had been backdated; and it also knew that it had still done nothing to

10  assure that financial controls were in place that would prevent backdating and assure that option grants

11  were properly accounted for.

12    109.



13

14

15

16

17    110.

18

19

20    111.

21

22

23

24

25

26

27

28

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

C.    **Injury to Apple**

1.  **Exercise of Option Grants at Improperly Deflated Prices.**

112.    During the relevant period, Anderson was awarded 7.9 million backdated options and eventually exercised 4.8 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

113.    During the relevant period, Timothy D. Cook, the current Chief Operating Officer who was senior vice president during the relevant period, was awarded 6 million backdated options and eventually exercised 5.3 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

114.    During the relevant period, Heinen was awarded over 3 million backdated options and eventually exercised 2.8 million of them, depriving Apple of millions of dollars that she would have paid to exercise these options had they not been backdated.

115.    During the relevant period, Ronald B. Johnson, senior vice president of the Company, was awarded 3 million backdated options and eventually exercised about 2.5 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

116.    During the relevant period, Mitchel Mandich, a senior vice president who resigned in October, 2000, was awarded over 3.3 million backdated options and eventually exercised almost 1 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

117.    During the relevant period, Peter Oppenheimer, Apple's current senior vice president and chief financial officer, was awarded about 1.6 million backdated options, and eventually exercised about 1.4 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

118.    During the relevant period, Jonathan Rubinstein, a senior vice president during the relevant period and currently a consultant to the company, was awarded about 7 million options and eventually exercised about 5.8 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

- 28 -

119.     During the relevant period, Phillip Schiller, an officer of the company, was awarded about 1.2 million backdated options, and eventually exercised about 1 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

120.     During the relevant period, Sina Tamaddon, an officer of the company, was awarded about 3 million backdated options and eventually exercised all of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

121.     During the relevant period, Avadis Tevanian, Jr., a senior vice president during the relevant period who resigned in 2006, was awarded about 6.6 million backdated options, and eventually exercised about 5.4 million of them, depriving Apple of millions of dollars that he would have paid to exercise these options had they not been backdated.

122.     During the relevant period, Jobs obtained and then exchanged both of his backdated options grants for common stock.  He then sold approximately half of those shares and recognized $295,725,936 in proceeds.  In addition, Jobs holds approximately 5.426 million shares of Apple stock which he obtained in exchange for his backdated options, which he has not yet sold.  Today, the stock is worth approximately $993 million. Some portion of this value is attributable to the backdating of the options that Jobs exchanged for these shares.

123.     Thousands of other Apple employees were also able to exercise millions of options at exercise prices that were artificially low as a result of the backdating procedures used.

**2.      Other Injuries.**

124.     In addition to the millions of dollars of losses suffered by Apple as underpriced options were exercised, Apple has suffered other losses from the backdating scheme.

125.     Apple has incurred millions of dollars in legal and accounting costs in

126.     The investigation of the Special Committee into backdating

127.     Restating its financial statements

128.     The SEC investigation

129.     The investigation of the U.S. Attorneys' Office

130.     Defending shareholder class action litigation

- 29 -
[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    131.   Trying to prevent shareholders from recovering any damages to compensate the

2    Company for losses it has suffered as a result of the backdating scheme.

3         **D.    Plaintiff's Discovery Of The Wrongdoing**

4    132.   Plaintiff was unaware that Apple might have been backdating options until June of

5    2006, when Apple first disclosed that it was investigating the possibility of backdating. Up until that

6    time, the backdating of options had been concealed from shareholders, from regulators and from the

7    markets.

8    133.   Although certain Apple shareholders commenced litigation soon after this disclosure,

9    the facts surrounding the backdating of options were not disclosed until much later.

10   134.   Although Apple disclosed, in October and December of 2006, that options had, in fact,

11   been backdated, and that $105 million would have to be deducted from previously reported earnings,

12   it did not disclose at that time which options had been backdated or by whom, and took the position

13   that current management, and the current board of directors, had been guilty of no wrongdoing in

14   connection with those options grants. Absent information to contradict those assertions, it would have

15   been difficult, or even impossible, to determine whether a demand would be required on the board, or

16   to draft a complaint that would be sufficiently detailed to state a cause of action and survive a motion

17   to dismiss.

18   135.   Plaintiff therefore sought to investigate these potential claims by pursuing its Books

19   and Records Proceeding, which it commenced promptly in October of 2006. After various motions to

20   dismiss and to stay that proceeding had been rejected by the Court, and the case had gone to trial in

21   September of 2007, the Court issued an order requiring the production of relevant minutes and

22   accounting records. Those records were not produced until November of 2007.

23   136.   Plaintiff did not discover, and could not have discovered, the nature and extent of the

24   wrongdoing until the production of those records.

25   **V.    FUTILITY OF DEMAND**

26   137.   In light of the facts set forth above, plaintiff has not made any demand on the Apple

27   Board to institute this action against themselves and other defendants. Such a demand is excused

28   because it would be futile. The board is incapable of making an independent and disinterested decision

- 30 -

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    to institute and vigorously prosecute this action because it is not disinterested and is exposed to a

2    substantial likelihood of liability in this action.

3         138.   At the time this action was commenced, the Apple Board was comprised of seven

4    directors: defendants Campbell, Drexler, Jobs, Levinson, and York, and non-defendant directors Gore

5    and Schmidt. A conflict of interest affecting four board members would therefore be enough to excuse

6    demand.

7         139.   Defendant Jobs is incapable of considering a demand because he was the principal

8    recipient of the improperly backdated stock option grants complained of herein, and, as the Company

9    has admitted, knowingly participated in and approved the backdating of options granted to himself and

10   to others. As noted above, the press release accompanying the Company's 10-K, issued in December

11   of 2006, said that

12       Although the investigation found that CEO Steve Jobs was aware of and recommended
         the selection of some favorable grant dates, he did not receive or financially benefit
13       from these grants or appreciate the accounting implications....

14   The release gives no details or explanation of its statement that Jobs was "aware of" and had

15   "recommended" the selection of "some" favorable grant dates; and, in particular, the release did not

16   disclose whether Jobs was involved in the selection of the grant dates for his own options.

17        140.   However, this coverup could not continue. In light of the facts disclosed in this

18   complaint, and in the SEC's complaint against Heinen and Anderson, it is clear that Jobs was at the

19   center of the options backdating scheme. He knew and approved of backdated options for both

20   himself, the key members of his management team, and others as well.

21        141.   The rest of the board is incapable of considering a demand that it bring any claims

22   against Jobs, who is considered indispensable to the Company. Since he returned to the Company in

23   1997, after co-founding it decades earlier, Apple's stock has soared, splitting twice, as the Company

24   successively produced and marketed the iMac personal computer, the iPod personal music player, and

25   now the iPhone. Jobs is given much of the credit for all of these successes. As a result, ever since the

26   backdating scandal erupted at Apple the board has gone out of its way to shield Jobs from any

27   responsibility for his actions. Thus, when it first disclosed that the largest backdated option had been

28   granted to Jobs himself, it hastened to add that "it was subsequently cancelled and resulted in no

                                              - 31 -

1  financial gain to the CEO;" and that its internal investigation had uncovered "no wrongdoing" by any

2  current member of the management team. Even though it publicly conceded that Jobs was aware that

3  backdating was going on, and had even participated in the selection of certain favorable dates for

4  options backdating, its public statements deliberately obfuscated exactly what Jobs did, while insisting

5  that Jobs had been "unaware" of the financial implications of his conduct and that he had not

6  personally benefited from it.

7      142.   Jobs not only bears responsibility for his intentional participation in and approval of

8  backdated option grants, but also, along with that of the other four director defendants, for abdicating

9  their responsibility to assure that appropriate financial controls were in place, and were being

10  enforced, concerning the granting and accounting for options grants.

11      143.   The four defendant directors would also have a fundamental conflict of interest in

12  considering bringing claims against themselves, because they are all exposed to almost certain liability

13  in this action. All four of them sat on the Apple Board during the period April 2000 - August 2001,

14  during which the entire board approved all options awards. As a result, each of them personally

15  approved millions of backdated options, and therefore is substantially likely to be held liable for

16  breaching his fiduciary duties.

17      144.   In addition, Campbell, York and Levinson (chair), acting as the Compensation

18  Committee after November of 2001, intentionally approved the award of many additional backdated

19  options after that point, as set forth above. In addition, emails cited in the SEC's complaint directly

20  establish that Levinson, as chairman of the Compensation Committee, directly and intentionally

21  participated in the backdating of Jobs' 7.5 million options at the end of 2001.

22      145.   The decisions of these defendants to issue or approve backdated options cannot be

23  protected by the business judgment rule, because such grants violated the terms of the Plans pursuant

24  to which they were granted. Moreover, backdating options directly caused the Company to issue false

25  and misleading financial reports, in violation of SEC and accounting rules, and exposed the Company

26  to multi-million-dollar liability in SEC, IRS, and regulatory and investor actions.

27      146.   Moreover, all of the director defendants abdicated their fiduciary duties by failing to

28  take any action whatsoever to assure that financial controls were in place, and were being followed,

1  for the granting of stock options so that they would be in conformity with Plan provisions and

2  Generally Accepted Accounting Principles. As noted above, for the entire period 1997-2002 neither

3  the board nor any committee ever once discussed or reviewed the financial controls for stock option

4  grants.

5      147.    Defendant York has additional conflicts of interest resulting from his personal financial

6  dealings with Apple. See, e.g., Greg Farrell, Investigator in Apple Probe had Conflicts, USA Today

7  (Jan. 8, 2007) ("In January 2000, York led an investor group that paid more than $700 million to buy

8  Micro Warehouse, a distributor of Macintosh computers and related products. York became chairman

9  and CEO. Over the next three years . . . Apple drew about 3% of its annual net sales from Micro

10  Warehouse. York sold the company's assets to CDW in September 2003 for $22 million.")

11     148.    The director defendants' conduct following the public disclosure of the backdating

12  improprieties is further evidence of the futility of any demand. At their direction, the Company has

13  moved to dismiss both the federal and state derivative actions. It also moved to dismiss the Books and

14  Records Proceeding and, when that failed, it created a "Special Litigation Committee" which entered

15  the proceeding and moved to stay it for an extended period.

16     149.    Moreover, these defendants have taken no action against anyone as a result of years of

17  backdated options but, rather, have taken the position that current management, and the directors who

18  approved these backdated options and failed to inculcate even the most basic financial controls to

19  prevent this practice, should remain with the company and no action should be taken against them.

20  ### COUNT I: BREACH OF FIDUCIARY DUTY
    ### (Against All Defendants)

21
22     150.    Plaintiffs incorporate by reference all previous paragraphs of this complaint.

23     151.    By intentionally participating in, authorizing and approving the issuance of backdated

24  options, defendants breached their fiduciary duties of loyalty, candor, good faith and care to the

25  corporation. Defendants Campbell, Drexler, Jobs, Levinson, and York's foregoing misconduct was

26  not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to,

27  and did, unduly benefit Apple executives at the expense of the Company.

28

- 33 -

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

152.     As alleged in detail herein, defendants Anderson (the CFO), Jobs (the CEO), and Heinen (the General Counsel and Secretary), as officers of the Company, had a fiduciary duty to, among other things, not use their positions as officers of the Company to benefit themselves and other Apple insiders at the expense of the Company, to act in the best interests of the Company, and to ensure that sufficient processes and internal controls were ensure that the Company's financial reporting was accurate. Anderson, as the CFO, of the Company, had a fiduciary duty to, among other things, ensure that the Company's financial statements were based on accurate financial information and prepared in accordance with GAAP. Heinen, as the General Counsel and Secretary, had a fiduciary duty to, among other things, ensure the accurate recording and documentation of Board meetings and decisions and the preparation of accurate stock option documentation.

153.     As alleged in detail herein, defendants, as officers and directors of the Company, breached their fiduciary duties by knowingly backdating and assisting the backdating of Apple stock options to themselves and to other Apple executives in violation of the Company's shareholder-approved Stock Plans.

154.     Defendants' misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit Apple executives at the expense of the Company.

155.     As a result of defendants' misconduct, millions of backdated options were issued at improperly low exercise prices, which cost the company well over $100 million.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

156.     Plaintiff incorporates by reference all previous paragraphs of this complaint.

157.     Defendants utterly abdicated their fiduciary duties of loyalty, care and good faith, as officers and directors of the Company, by failing to take any action at all to devise or to monitor any system of corporate financial controls concerning the granting of options or the accounting for them. As noted above, this subject never came up during five years of board and committee meetings, during which millions of backdated options were issued at improperly low exercise prices, which cost the company well over $100 million.

- 34 -

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT III: CORPORATE WASTE AND INDUCING BREACH OF CONTRACT
### (Against All Director Defendants and Jobs)

158.    Plaintiff incorporates by reference all previous paragraphs of this complaint.

159.    As alleged in detail herein, by causing the Company to issue millions of options in violation of the terms of its stock option plans, the director defendants, together with Jobs, caused the Company to breach its contractual obligations and thereby committed waste. They caused the Company to issue of millions of options at exercise prices that were improperly low, costing the Company over $100 million.

160.    Defendants' misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Apple executives at the expense of the Company.

## COUNT IV: SELF-DEALING
### (Against Defendants Anderson, Heinen and Jobs)

161.    Plaintiff incorporates by reference all previous paragraphs of this complaint.

162.    As alleged in detail herein, defendants Anderson, Heinen and Jobs, as officers of Apple, caused Apple to issue to themselves millions of options providing for improperly low exercise prices, and/or participated in a scheme to cause such backdated options to be issued to themselves.

163.    These transactions were unfair to Apple and constitute a breach of the duty of loyalty.

## COUNT IV: UNJUST ENRICHMENT
### (Against Defendants Anderson, Heinen and Jobs)

164.    Plaintiff incorporates by reference all previous paragraphs of this complaint.

165.    Defendants Anderson Heinen and Jobs were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising or exchanging the backdated stock options.

166.    The Court should order these defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, exchanged, sold, pledged, or otherwise monetized.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Apple, prays for judgment as follows:

1       1. Awarding damages against all defendants, jointly and severally, in an amount to be

2  proven at trial;

3       2. Awarding restitution, disgorgement of all illicit proceeds generated as a result of the

4  wrongful conduct alleged herein;

5       3. Awarding appropriate equitable relief, including the imposition of a constructive trust

6  over defendants' stock options and any proceeds derived therefrom;

7       4. Awarding pre-judgment interest, as well as reasonable attorneys' fees and other costs; and

8       5. Awarding such other relief as this Court may deem just and proper.

9  **JURY TRIAL DEMAND**

10      Plaintiffs demand a trial by jury of all issues so triable.

11  Dated:  September 5, 2008

12                        By: _____

13                             JOSEPH J. TABACCO, JR.

14                      Nicole Lavallee
                    James Magid

15                      **BERMAN DEVALERIO PEASE
                    TABACCO BURT & PUCILLO LLP**
                    425 California Street, Suite 2100

16                      San Francisco, CA  94104
                    (415) 433-3200

17

18                      H. Adam Prussin
                    **POMERANTZ HAUDEK BLOCK

19                      GROSSMAN & GROSS LLP**
                    100 Park Avenue, 26th Floor

20                      New York, NY  10017
                    (212) 661-1100

21                      Attorneys for Plaintiff

22

23

24

25

26

27

28

[108CV110403] AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

# EXHIBIT 1

# E-FILED

Sep 28, 2007 4:46 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-06-CV-074226 Filing #G-5294
By R. Walker, Deputy

1

2

3

4

5

6

7

8                          SUPERIOR COURT OF CALIFORNIA

9                             COUNTY OF SANTA CLARA

10

11   BOSTON RETIREMENT BOARD, fiduciary         Case No.: 1-06-CV-074226
     of the STATE-BOSTON RETIREMENT
12   SYSTEM,
13
                    Petitioner,
14
15           vs.
                                                ORDER REGARDING PETITION
16   APPLE COMPUTER, INC.,                       FOR WRIT OF MANDATE
17                  Respondent.                  JUDGMENT
18
19
20           On September 24, 2007, commencing at 9:00 a.m. in Department 17C of the Santa

21   Clara County Superior Court, the Court presided over the trial regarding Petitioner Boston

22   Retirement Board's Petition for Writ of Mandate to Compel Inspection of Books, Records and

23   Documents Pursuant to Cal. Corp. Code § 1601 and § 1603.  The Court granted the petition

24   with respect to accounting books and records and minutes of proceeding of Respondent Apple,

25   Inc.'s board of directors and committees thereof, subject to assertions of privilege based on

26   attorney-client and work-product privilege.

27           ///

28           ///

_Boston Retirement Board v. Apple Computer, Inc._                                            1
_Santa Clara County Superior Court, Case No. 1-06-CV-074226_
_Order Regarding Petition for Writ of Mandate and Judgment_

E-Filed: Sep 28, 2007 4:46 PM, Superior Court of CA, County of Santa Clara, Case #1-06-CV-074226 Filing #G-5284

ACCORDINGLY, IT IS HEREBY ORDERED AND ADJUDGED that:

1.    The petition for writ requiring the inspection and permitting the copying of the accounting books and records of Respondent Apple, Inc., as well as the minutes of the proceedings of the board of directors and committees of the board, is granted.

2.    The petition is denied with respect to all other requests for inspection and copying of corporate document, unless the documents are accounting records.

3.    The documents to be produced for inspection are subject to any claim of privilege based upon attorney-client and work-product privilege.   To the extent any claim of privilege is asserted with respect to certain documents, including minutes, the matter may be submitted to the Court if the parties cannot reach agreement. The parties shall submit specific briefing as to the particular document that is sought for inspection and claimed to be privilege.

4.    Any such documents that are produced and copied are subject to a protective order.  The model protective order for the Complex Division of the Santa Clara County Superior Court contains the material terms of the protective order that applies to any documents produced or copied in this action.

5.    Each party shall bear its own fees and costs.


SO ORDERED.


Dated:  September 28, 2007              /s/    Jack Komar
                                       Judge of the Superior Court

# EXHIBITS 2-7
## Lodged Under Seal

# EXHIBIT 8

Board of Directors
August 4, 1998

APPLEBRB0002938
CONFIDENTIAL

MINUTES OF A MEETING OF
THE BOARD OF DIRECTORS OF
APPLE COMPUTER, INC.
August 4, 1998

Pursuant to notice duly given, the Board of Directors of Apple Computer, Inc. held a regular meeting of the Board, on August 4, 1998, commencing at 9:00 a.m. local time.

Present at the commencement of the meeting were the following directors of the Corporation:

Edgar S. Woolard, Jr.
Gareth C. C. Chang
William V. Campbell
Steven P. Jobs

Lawrence J. Ellison joined the meeting while it was in progress. Jerome B. York was unable to attend. Also present for all or a portion of the meeting by invitation of the Board were Fred Anderson, Executive Vice President and Chief Financial Officer, and Nancy R. Heinen, Senior Vice President, General Counsel and Secretary of the Corporation.

Mr. Jobs chaired the meeting and Ms. Heinen kept the minutes. A quorum being present, the chairman called the meeting to order.

*Compensation Committee Report*

Mr. Woolard reported on the actions of the Compensation Committee at its meeting held earlier that morning. The Compensation Committee approved prior meeting minutes, option grants under the 1998 Executive Officer Stock Plan and the 1997 Employee Stock Option Plan, option grant guidelines, and proposed changes to the Corporation's severance plan. Mr. Woolard reported that, subject to full Board approval, the Committee approved an additional four million shares be made available for grant under the 1997 Employee Stock Option Plan. After discussion and upon motion duly made and seconded, it was unanimously:

*1997 Employee Stock Option Plan Share Increase*

RESOLVED, that the Board hereby amends and restates the 1997 Employee Stock Option Plan (the "1997 Plan") as set for in Exhibit A, to increase by four million shares the number of shares of Common Stock of the Corporation that may be issued under the 1997 Plan;

RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, for and in the name and on behalf of the Corporation, to execute and deliver any and all certificates, agreements and other documents, take any and all steps and do any and all things

APPLEBRB0002939
CONFIDENTIAL

which they may deem necessary or advisable in order to effectuate the
purposes and intent of each and all of the foregoing resolutions.

REDACTED

APPLEBRB0002940
CONFIDENTIAL

*Approval of Prior Minutes*

Ms. Heinen asked that the Board approve the minutes of recent Board and Committee meetings. Following discussion, and upon motion duly made and seconded, it was unanimously:

RESOLVED, that the minutes of the following meetings of this Board and its Committees, as written and presented to the Board, are hereby ratified and approved:

| Date | Minutes |
|------|---------|
| April 22, 1998 | Board of Directors |
| April 22, 1998 | Compensation Committee |
| April 22, 1998 | Annual Meeting of Shareholders |

# REDACTED

APPLEBRB0002941
CONFIDENTIAL

REDACTED

APPLEBRB0002942
CONFIDENTIAL

REDACTED

There being no further business, the meeting was duly adjourned at approximately 1:30 p.m.

Nancy R. Heinen
Secretary

*98.08.04 Board of Directors Meeting*                    5

APPLEBRB0002943
CONFIDENTIAL

APPLE COMPUTER, INC.
1997 EMPLOYEE STOCK OPTION PLAN
(as amended through 8/4/98)

1.    Purposes of the Plan.  The purposes of this 1997 Employee Stock Option Plan are to assist the Company in attracting and retaining high quality personnel, to provide additional incentive to Employees who are not Directors or Officers of the Company and to promote the success of the Company's business.  Options granted under the Plan shall be Nonstatutory Stock Options.  SARs granted under the Plan may be granted in connection with Options or independently of Options.

2.    Definitions.  As used herein, the following definitions shall apply:

"*Administrator*" means the Board or any of its Committees, as shall be administering the Plan from time to time pursuant to Section 4 of the Plan.

"*Affiliated Company*" means a corporation which is not a Subsidiary but with respect to which the Company owns, directly or indirectly through one or more Subsidiaries, at least twenty percent of the total voting power, unless the Administrator determines in its discretion that such corporation is not an Affiliated Company.

"*Applicable Laws*" shall have the meaning set forth in Section 4 of the Plan.

"*Board*" means the Board of Directors of the Company.

"*Change in Control*" shall have the meaning set forth in Section 10 of the Plan.

"*Change in Control Price*" shall have the meaning set forth in Section 12 of the Plan.

"*Common Stock*" means the common stock, no par value, of the Company.

"*Company*" means Apple Computer, Inc., a California corporation, or its successor.

"*Committee*" means a Committee, if any, appointed by the Board in accordance with Section 4(a) of the Plan.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and any successor thereto.

"*Continuous Status as an Employee*" means the absence of any interruption or termination of the employment relationship with the Company or any Subsidiary or Affiliated Company.  Continuous Status as an Employee shall not be considered interrupted in the case of (i) medical leave, military leave, family leave, or any other leave of absence approved by the Administrator, provided, in each case, that such leave does not result in termination of the employment relationship with the Company or

APPLEBRB0002944
CONFIDENTIAL

any Subsidiary or Affiliated Company, as the case may be, under the terms of the respective Company policy for such leave; or (ii) in the case of transfers between locations of the Company or between the Company, its Subsidiaries, its successor or its Affiliated Companies.

"*Director*" means a member of the Board.

"*Employee*" means any person, employed by and on the payroll of the Company, any Subsidiary or any Affiliated Company.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fair Market Value*" means the value of Common Stock determined as follows:

(i)    If the Common Stock is listed on any established stock exchange or a national market system (including without limitation the National Market System of the National Association of Securities Dealers, Inc. Automated Quotation ("*NASDAQ*") System), its Fair Market Value shall be the closing sales price for such stock or the closing bid if no sales were reported, as quoted on such system or exchange (or the exchange with the greatest volume of trading in the Common Stock) for the date of determination or, if the date of determination is not a trading day, the immediately preceding trading day, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable.

(ii)    If the Common Stock is regularly quoted on the NASDAQ System (but not on the National Market System) or quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value shall be the mean between the high and low asked prices for the Common Stock on the date of determination or, if there are no quoted prices on the date of determination, on the last day on which there are quoted prices prior to the date of determination.

(iii)    In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Administrator.

"*Nonstatutory Stock Option*" means an Option that is not intended to be an incentive stock option within the meaning of Section 422 of the Code.

"*Officer*" means any individual designated by the Board as an elected officer of the Company.

"*Option*" means an option granted pursuant to the Plan.

"*Optioned Stock*" means the Common Stock subject to an Option or SAR.

"*Optionee*" means an Employee who receives an Option or SAR.

"*Parent*" corporation shall have the meaning defined in Section 424(e) of the Code.

APPLEBRB0002945
CONFIDENTIAL

"*Plan*" means this Apple Computer, Inc. 1997 Employee Stock Option Plan.

"*SAR*" means a stock appreciation right granted pursuant to Section 9 below.

"*Section 3 Limit*" shall have the meaning set forth in Section 3 of the Plan.

"*Share*" means a share of the Common Stock, as adjusted in accordance with Section 12 of the Plan.

"*Sixty-Day Period* " shall have the meaning set forth in Section 12(f) of the Plan.

"*Subsidiary*" corporation has the meaning defined in Section 424(f) of the Code.

"*Tax Date*" shall have the meaning set forth in Section 9 of the Plan.

3.      Stock Subject to the Plan.

(a)     Limit.  Subject to the provisions of Section 12 of the Plan, the maximum aggregate number of Shares which may be optioned and sold under the Plan or for which SARs may be granted and exercised is 9,000,000 Shares (the "*Section 3 Limit*").  The Shares may be authorized but unissued or reacquired Common Stock.  In the discretion of the Administrator, any or all of the Shares authorized under the Plan may be subject to SARs issued pursuant to the Plan.

(b)     Rules Applicable to the Calculation of the Section 3 Limit.  In calculating the number of Shares available for issuance under the Plan, the following rules shall apply:

(i)     The Section 3 Limit shall be reduced by the number of Shares of Optioned Stock subject to each outstanding Option or freestanding SAR.

(ii)    The Section 3 Limit shall be increased by the number of Shares of Optioned Stock subject to the portion of an Option or SAR that expires unexercised or is forfeited for any reason.

(iii)   The Section 3 Limit shall be increased by the number of Shares tendered to pay the exercise price of an Option or the number of Shares of Optioned Stock withheld to satisfy an Optionee's tax liability in connection with the exercise of an Option or SAR.

(iv)    Option Stock subject to both an outstanding Option and SAR granted in connection with the Option shall be counted only once in calculating the Section 3 Limit.

4.      Administration of the Plan.

APPLEBRB0002946
CONFIDENTIAL

(a)   <u>Composition of Administrator</u>.  The Plan may be administered by (i) the Board or (ii) a Committee designated by the Board, which Committee shall be constituted in such a manner as to satisfy the applicable securities laws, California corporate law and the Code (collectively, "*Applicable Laws*").

Once a Committee has been appointed pursuant to this Section 4(a), such Committee shall continue to serve in its designated capacity until otherwise directed by the Board.  From time to time the Board may increase the size of the Committee and appoint additional members thereof, remove members (with or without cause) and appoint new members in substitution therefor, fill vacancies (however caused) and remove all members of the Committee and thereafter directly administer the Plan, all to the extent permitted by the Applicable Laws.

(b)   <u>Powers of the Administrator</u>.  Subject to the provisions of the Plan and, in the case of the Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in its discretion:  (i) to determine the Fair Market Value of the Common Stock in accordance with the Plan; (ii) to determine, in accordance with Section 8(a) of the Plan, the exercise price per Share of Options and SARs to be granted; (iii) to determine the Employees to whom, and the time or times at which, Options and SARs shall be granted and the number of Shares to be represented by each Option or SAR (including, without limitation, whether or not a corporation shall be excluded from the definition of Affiliated Company); (iv) to construe and interpret the provisions of the Plan and any agreements or certificates issued under or in connection with the Plan; (v) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Option or SAR granted hereunder (including, but not limited to, any restriction or limitation, or any vesting acceleration or waiver of forfeiture restrictions regarding any Option or SAR or the Shares relating thereto, based in each case on such factors as the Administrator shall determine, in its sole discretion); (vi) to approve forms of agreement for use under the Plan; (vii) to prescribe, amend and rescind rules and regulations relating to the Plan; (viii) to modify or amend each Option or SAR or accelerate the exercise date of any Option or SAR; (ix) to reduce the exercise price of any Option or SAR to the then current Fair Market Value if the Fair Market Value of the Common Stock covered by such Option or SAR shall have declined since the date the Option or SAR was granted; (x) to authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an Option or SAR previously granted by the Administrator; and (xi) to make all other determinations deemed necessary or advisable for the administration of the Plan.

(c)   <u>Effect of Decisions by the Administrator</u>.  All decisions, determinations and interpretations of the Administrator shall be final and binding on all Optionees and any other holders of any Options.

5.    <u>Eligibility</u>.  The Administrator may grant Options and SARs only to individuals who are Employees or who are consultants to the Company, or a Subsidiary or Affiliated Company.  In no event may an Option or SAR be granted to any individual who, at the time of grant, is an Officer or Director.  An Employee who has been granted an Option or SAR may, if he or she is otherwise eligible, be granted

APPLEBRB0002947
CONFIDENTIAL

an additional Option or Options, SAR or SARs. Each Option shall be evidenced by a written Option agreement, which shall be in such form and contain such provisions as the Administrator shall from time to time deem appropriate. Without limiting the foregoing, the Administrator may, at any time, or from time to time, authorize the Company, with the consent of the respective recipients, to issue new Options or Options in exchange for the surrender and cancellation of any or all outstanding Options, other options, SARs or other stock appreciation rights.

Neither the Plan nor any Option or SAR agreement shall confer upon any Optionee any right with respect to continuation of employment by the Company (or any Parent, Subsidiary or Affiliated Company), nor shall it interfere in any way with the Optionee's right or the right of the Company (or any Parent, Subsidiary or Affiliated Company) to terminate the Optionee's employment at any time or for any reason.

If an Option or SAR is granted to an individual who is a consultant to the Company or any Subsidiary or Affiliate, all references in the Plan to "Employee" shall be deemed to include the term "consultant" and all references in the Plan to "employment," "Continuous Status as an Employee" and "termination of employment" shall be deemed to refer to the individual's consultancy or status as a consultant.

6.    Term of Plan. The Plan shall become effective upon its adoption by the Board. It shall continue in effect for a term of ten years unless sooner terminated under Section 14 of the Plan.

7.    Term of Option. The term of each Option shall be ten (10) years from the date of grant thereof or such shorter term as may be provided in the Option agreement.

8.    Exercise Price and Consideration.

(a)    Exercise Price. The per Share exercise price for the Shares issuable pursuant to an Option shall be such price as is determined by the Administrator, but shall in no event be less than 100% of the Fair Market Value of Common Stock, determined as of the date of grant of the Option. In the event that the Administrator shall reduce the exercise price, the exercise price shall be no less than 100% of the Fair Market Value as of the date of that reduction.

(b)    Method of Payment. The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall be determined by the Administrator and may consist of (i) cash, (ii) check, (iii) promissory note, (iv) other Shares which have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised, (v) delivery of a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company the amount of sale or loan proceeds required to pay the exercise price, or (vi) any combination of the foregoing methods of payment and/or any other consideration or method of payment as shall be permitted under applicable corporate law:

APPLEBRB0002948
CONFIDENTIAL

9.      <u>Stock Appreciation Rights</u>.

  (a) <u>Granted in Connection with Options</u>.  At the sole discretion of the Administrator, SARs may be granted in connection with all or any part of an Option, either concurrently with the grant of the Option or at any time thereafter during the term of the Option.  The following provisions apply to SARs that are granted in connection with Options:

  (i) The SAR shall entitle the Optionee to exercise the SAR by surrendering to the Company unexercised a portion of the related Option. .The Optionee shall receive in exchange from the Company an amount equal to the excess of (x) the Fair Market Value on the date of exercise of the SAR of the Common Stock covered by the surrendered portion of the related Option over (y) the exercise price of the Common Stock covered by the surrendered portion of the related Option.  Notwithstanding the foregoing, the Administrator may place limits on the amount that may be paid upon exercise of an SAR; *provided, however,* that such limit shall not restrict the exercisability of the related Option.

  (ii) When an SAR is exercised, the related Option, to the extent surrendered, shall no longer be exercisable.

  (iii) An SAR shall be exercisable only when and to the extent that the related Option is exercisable and shall expire no later than the date on which the related Option expires.

  (iv) An SAR may only be exercised at a time when the Fair Market Value of the Common Stock covered by the related Option exceeds the exercise price of the Common Stock covered by the related Option.

  (b) <u>Independent SARs</u>.  At the sole discretion of the Administrator, SARs may be granted without related Options.  The following provisions apply to SARs that are not granted in connection with Options:

  (i) The SAR shall entitle the Optionee, by exercising the SAR, to receive from the Company an amount equal to the excess of (x) the Fair Market Value of the Common Stock covered by exercised portion of the SAR, as of the date of such exercise, over (y) the Fair Market Value of the Common Stock covered by the exercised portion of the SAR, as of the date on which the SAR was granted; *provided, however,* that the Administrator may place limits on the amount that may be paid upon exercise of an SAR.

  (ii) SARs shall be exercisable, in whole or in part, at such times as the Administrator shall specify in the Optionee's SAR agreement.

  (c) <u>Form of Payment</u>.  The Company's obligation arising upon the exercise of an SAR may be paid in Common Stock or in cash, or in any combination of Common Stock and cash, as the Administrator, in its sole discretion, may determine.  Shares issued upon the exercise of an SAR shall be valued at their Fair Market Value as of the date of exercise.

APPLEBRB0002949
CONFIDENTIAL

10.    Method of Exercise.

(a)    Procedure for Exercise; Rights as a Shareholder.  Any Option or SAR granted hereunder shall be exercisable at such times and under such conditions as determined by the Administrator and as shall be permissible under the terms of the Plan.

An Option or SAR shall be deemed to be exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Option or SAR by the person entitled to exercise the Option or SAR and full payment for the Shares with respect to which the Option is exercised has been received by the Company.  Full payment may, as authorized by the Administrator and permitted by the Option agreement, consist of any consideration and method of payment allowable under Section 8(b) of the Plan.  Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the stock certificate evidencing such Shares, no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 12 of the Plan.  An Option or SAR may not be exercised with respect to a fraction of a Share.

(b)    Termination of Continuous Employment.  Upon termination of an Optionee's Continuous Status as Employee (other than termination by reason of the Optionee's death), the Optionee may, but only within ninety days after the date of such termination, exercise his or her Option or SAR to the extent that it was exercisable at the date of such termination.  Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

(c)    Death of Optionee.  In the event of the death of an Optionee:

(i)    Who is at the time of death an Employee and who shall have been in Continuous Status as an Employee since the date of grant of the Option, the Option or SAR may be exercised at any time within six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) following the date of death by the Optionee's estate or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent of the right to exercise that would have accrued had the Optionee continued living and terminated his or her employment six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) after the date of death; or

(ii)    Within ninety days after the termination of Continuous Status as an Employee, the Option or SAR may be exercised, at any time within six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) following the date of death by the Optionee's estate or by a person who acquired the right to exercise the Option by bequest or inheritance,

APPLEBRB0002950
CONFIDENTIAL

but only to the extent of the right to exercise that had accrued at the date of termination.

Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

(d)     Stock Withholding to Satisfy Withholding Tax Obligations. When an Optionee incurs tax liability in connection with the exercise of an Option or SAR, which tax liability is subject to tax withholding under applicable tax laws, and the Optionee is obligated to pay the Company an amount required to be withheld under applicable tax laws, the Optionee may satisfy the withholding tax obligation (including, at the election of the Optionee, any additional amount which the Optionee desires to have withheld in order to satisfy in whole or in part the Optionee's full estimated tax in connection with the exercise) by electing to have the Company withhold from the Shares to be issued upon exercise of the Option, or the Shares to be issued upon exercise of the SAR, if any, that number of Shares having a Fair Market Value equal to the amount required to be withheld (and any additional amount desired to be withheld, as aforesaid). The Fair Market Value of the Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined (the "*Tax Date*").

All elections by an Optionee to have Shares withheld for this purpose shall be made in writing in a form acceptable to the Administrator and shall be subject to the following restrictions:

(i)     the election must be made on or prior to the applicable Tax Date; and

(ii)     all elections shall be subject to the consent or disapproval of the Administrator.

11.     Non-Transferability of Options. Options and SARs may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by will or by the laws of descent or distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act, or the rules thereunder; *provided, however*, that the Administrator may grant Nonstatutory Stock Options that are freely transferable. The designation of a beneficiary by an Optionee or holder of an SAR does not constitute a transfer. An Option or an SAR may be exercised, during the lifetime of the Optionee or SAR holder, only by the Optionee or SAR holder or by a transferee permitted by this Section 11.

12.     Adjustments Upon Changes in Capitalization or Merger.

(a)     Changes in Capitalization. Subject to any required action by the shareholders of the Company, the number of Shares covered by each outstanding Option and SAR, and the number of Shares which have been authorized for issuance under the Plan but as to which no Options or SARs have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Option or SAR, as well as the price per Share covered by each such outstanding Option or SAR, shall be

APPLEBRB0002951
CONFIDENTIAL

proportionately adjusted for any increase or decrease in the number of issued Shares resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the aggregate number of issued Shares effected without receipt of consideration by the Company; *provided, however,* that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Administrator, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Option or SAR.

(b)     Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, all outstanding Options and SARs will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Administrator. The Administrator may, in the exercise of its sole discretion in such instances, declare that any Option or SAR shall terminate as of a date fixed by the Administrator and give each Optionee the right to exercise his or her Option or SAR as to all or any part of the Optioned Stock or SAR, including Shares as to which the Option or SAR would not otherwise be exercisable.

(c)     Sale of Assets or Merger. Subject to the provisions of Section 12(d), in the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, each outstanding Option and SAR shall be assumed or an equivalent option or stock appreciation right shall be substituted by such successor corporation or a parent or subsidiary of such successor corporation, unless the Administrator determines, in the exercise of its sole discretion and in lieu of such assumption or substitution, that the Optionee shall have the right to exercise the Option or SAR as to all of the Optioned Stock, including Shares as to which the Option or SAR would not otherwise be exercisable. If the Administrator makes an Option or SAR fully exercisable in lieu of assumption or substitution in the event of a merger or sale of assets, the Company shall notify the Optionee that the Option or SAR shall be fully exercisable for a period of thirty (30) days from the date of such notice, and the Option or SAR will terminate upon the expiration of such period. For purposes of this paragraph, an Option granted under the Plan shall be deemed to be assumed if, following the sale of assets or merger, the Option confers the right to purchase, for each Share of Optioned Stock subject to the Option immediately prior to the sale of assets or merger, the consideration (whether stock, cash or other securities or property) received in the sale of assets or merger by holders of Common Stock for each Share held on the effective date of the transaction (and if such holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the sale of assets or merger was not solely Common Stock of the successor corporation or its parent, the Administrator may, with the consent of the successor corporation and the participant, provide for the per share consideration to be received upon exercise of the Option to be solely Common Stock of the successor corporation or its parent equal in Fair Market Value to the per share consideration received by holders of Common Stock in the sale of assets or merger.

APPLEBRB0002952
CONFIDENTIAL

(d)    Change in Control.  In the event of a "Change in Control" of the Company, as defined in Section 12(e), unless otherwise determined by the Administrator prior to the occurrence of such Change in Control, the following acceleration and valuation provisions shall apply:

(i)    Any Options and SARs outstanding as of the date such Change in Control is determined to have occurred that are not yet exercisable and vested on such date shall become fully exercisable and vested; and

(ii)    The value of all outstanding Options and SARs shall, unless otherwise determined by the Administrator at or after grant, be cashed-out.  The amount at which such Options and SARs shall be cashed out shall be equal to the excess of (x) the Change in Control Price (as defined below) over (y) the exercise price of the Common Stock covered by the Option or SAR.  The cash-out proceeds shall be paid to the Optionee or, in the event of death of an Optionee prior to payment, to the estate of the Optionee or to a person who acquired the right to exercise the Option or SAR by bequest or inheritance.

(e)    "Definition of "Change in Control".  For purposes of this Section 12, a "Change in Control" means the happening of any of the following:

( i )    When any "person", as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, a Subsidiary or a Company employee benefit plan, including any trustee of such plan acting as trustee) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities; or

(ii)    The occurrence of a transaction requiring shareholder approval, and involving the sale of all or substantially all of the assets of the Company or the merger of the Company with or into another corporation.

(f)    Change in Control Price.  For purposes of this Section 12, "Change in Control Price" shall be, as determined by the Administrator, (i) the highest Fair Market Value at any time within the sixty-day period immediately preceding the date of determination of the Change in Control Price by the Administrator (the "*Sixty-Day Period*"), or (ii) the highest price paid or offered, as determined by the Administrator, in any bona fide transaction or bona fide offer related to the Change in Control of the Company, at any time within the Sixty-Day Period.

APPLEBRB0002953
CONFIDENTIAL

13.    <u>Time of Granting Options and SARs</u>.  The date of grant of an Option or SAR shall, for all purposes, be the date on which the Administrator makes the determination granting such Option or SAR.  Notice of the determination shall be given to each Employee to whom an Option or SAR is so granted within a reasonable time after the date of such grant.

14.    <u>Amendment and Termination of the Plan</u>.

(a)    <u>Amendment and Termination</u>.  The Board may at any time amend, alter, suspend or terminate the Plan, as it may deem advisable.

(b)    <u>Effect of Amendment or Termination</u>.  Any such amendment, alteration, suspension or termination of the Plan shall not impair the rights of any Optionee or SAR holder under any grant theretofore made without his or her consent.  Such Options and SARs shall remain in full force and effect as if this Plan had not been amended or terminated.

15.    <u>Conditions Upon Issuance of Shares</u>.  Shares shall not be issued with respect to an Option or SAR unless the exercise of such Option or SAR and the issuance and delivery of such Shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, and the requirements of any stock exchange or quotation system upon which the Shares may then be listed or quoted, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an Option or SAR or the issuance of Shares upon exercise of an Option or SAR, the Company may require the person exercising such Option or SAR to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned relevant provisions of law.

Inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the non-issuance or sale of such Shares as to which such requisite authority shall not have been obtained.

16.    <u>Reservation of Shares</u>.  The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

APPLEBRB0002954
CONFIDENTIAL

# EXHIBITS 9-15
## LODGED UNDER SEAL

# EXHIBIT 16

CEO Compensation Committee
Consent January 12, 2000

APPLEBRB0003386
CONFIDENTIAL

Unanimous Written Consent
of the
CEO Compensation Committee of
Apple Computer, Inc.

January 12, 2000

William V. Campbell and Edgar S. Woolard, Jr., constituting all the members of the CEO Compensation Committee of the Board of Directors of Apple Computer, Inc. (the "Company"), hereby execute this written consent effective as of January 12, 2000.

WHEREAS, the CEO Compensation Committee has been authorized by the Board of Directors at its meeting of December 2, 1999 to establish the compensation for the Chief Executive Officer of the Company, within the guidelines approved by the Board, for such officer's past and future services to the Company;

WHEREAS, Steven P. Jobs has agreed to accept the position of Chief Executive Officer of the Company on a permanent, rather than interim, basis;

NOW, THEREFORE, BE IT RESOLVED, that the Company hereby grants to Steven P. Jobs options to purchase 10 million shares of the Company's common stock under the 1998 Executive Stock Option Plan, at an exercise price per share equal to the closing price on the date of grant. The options shall have a ten-year term, and 50% of the options shall be immediately vested and exercisable, 25% shall vest on July 7, 2000, and the remaining 25% shall vest on July 7, 2001;

RESOLVED, that at his request, Mr. Jobs' salary will remain at $1 per year; and

RESOLVED, that any officer of the Company is hereby authorized and directed to execute and deliver such documents and take any actions as such officer shall deem necessary or advisable in carrying out the intent of these resolutions, and any actions taken by any officer to date related to this matter are hereby ratified, approved and confirmed as the acts of the Board of Directors of the Company.

_____
William V. Campbell


_____
Edgar S. Woolard, Jr.

APPLEBRB0003387
CONFIDENTIAL

**Unanimous Written Consent**
**of the**
**CEO Compensation Committee of**
**Apple Computer, Inc.**

**January 12, 2000**

William V. Campbell and Edgar S. Woolard, Jr., constituting all the members of the CEO Compensation Committee of the Board of Directors of Apple Computer, Inc. (the "Company"), hereby execute this written consent effective as of January 12, 2000.

WHEREAS, the CEO Compensation Committee has been authorized by the Board of Directors at its meeting of December 2, 1999 to establish the compensation for the Chief Executive Officer of the Company, within the guidelines approved by the Board, for such officer's past and future services to the Company;

WHEREAS, Steven P. Jobs has agreed to accept the position of Chief Executive Officer of the Company on a permanent, rather than interim, basis;

NOW, THEREFORE, BE IT RESOLVED, that the Company hereby grants to Steven P. Jobs options to purchase 10 million shares of the Company's common stock under the 1998 Executive Stock Option Plan, at an exercise price per share equal to the closing price on the date of grant. The options shall have a ten year term, and 50% of the options shall be immediately vested and exercisable, 25% shall vest on July 7, 2000, and the remaining 25% shall vest on July 7, 2001;

RESOLVED, that at his request, Mr. Jobs' salary will remain at $1 per year; and

RESOLVED, that any officer of the Company is hereby authorized and directed to execute and deliver such documents and take any actions as such officer shall deem necessary or advisable in carrying out the intent of these resolutions, and any actions taken by any officer to date related to this matter are hereby ratified, approved and confirmed as the acts of the Board of Directors of the Company.

William V. Campbell

Edgar S. Woolard, Jr.

APPLEBRB0003388
CONFIDENTIAL

**Unanimous Written Consent
of the
CEO Compensation Committee of
Apple Computer, Inc.**

**January 12, 2000**

William V. Campbell and Edgar S. Woolard, Jr., constituting all the members of the CEO Compensation Committee of the Board of Directors of Apple Computer, Inc. (the "Company"), hereby execute this written consent effective as of January 12, 2000.

WHEREAS, the CEO Compensation Committee has been authorized by the Board of Directors at its meeting of December 2, 1999 to establish the compensation for the Chief Executive Officer of the Company, within the guidelines approved by the Board, for such officer's past and future services to the Company;

WHEREAS, Steven P. Jobs has agreed to accept the position of Chief Executive Officer of the Company on a permanent, rather than interim, basis;

NOW, THEREFORE, BE IT RESOLVED, that the Company hereby grants to Steven P. Jobs options to purchase 10 million shares of the Company's common stock under the 1998 Executive Stock Option Plan, at an exercise price per share equal to the closing price on the date of grant. The options shall have a ten-year term, and 50% of the options shall be immediately vested and exercisable, 25% shall vest on July 7, 2000, and the remaining 25% shall vest on July 7, 2001;

RESOLVED, that at his request, Mr. Jobs' salary will remain at $1 per year; and

RESOLVED, that any officer of the Company is hereby authorized and directed to execute and deliver such documents and take any actions as such officer shall deem necessary or advisable in carrying out the intent of these resolutions, and any actions taken by any officer to date related to this matter are hereby ratified, approved and confirmed as the acts of the Board of Directors of the Company.

William V. Campbell

Edgar S. Woolard, Jr.

APPLEBRB0003389
CONFIDENTIAL

# EXHIBITS 17-19
## Lodged Under Seal

# EXHIBIT 20

Board of Directors Consent
January 17, 2001

APPLEBRB0003565
CONFIDENTIAL

ACTION BY UNANIMOUS WRITTEN
CONSENT OF THE
BOARD OF DIRECTORS
OF APPLE COMPUTER, INC.
January 17, 2001

The undersigned, being all of the members of the Board of Directors (the "Board") of Apple Computer, Inc. (the "Corporation"), hereby adopt, by this unanimous written consent, in accordance with Section 307(b) of the California Corporations Code and Sections 11.8 and 11.9 of the By-Laws of the Corporation, the following resolutions with the same force and effect as if they had been unanimously adopted at a duly convened meeting of the Board.

The Board is the Administrator of the 1998 Executive Officer Stock Plan ("1998 Plan") and is duly authorized to grant options under the Plan consistent with Section 408 of the California Corporations Code (the "California Code").

## Section 16(b) Officer Grants – 1998 Plan

WHEREAS, it has been recommended that the Board consider a grant of options under the 1998 Plan to the executive officers listed on Exhibit A totaling 4,800,000 options.

RESOLVED, that each person listed on Exhibit A is hereby granted an option under the 1998 Plan to acquire the number of shares of Common Stock listed opposite his or her name at an exercise price equal to the closing price for the Corporation's Common Stock on the date of grant;

RESOLVED, that each option shall contain a provision which provides that in the event of a Change in Control, as defined in Exhibit B attached hereto, and if in connection with or following such Change in Control, his or her employment is terminated other than for "Cause" or if he or she should resign for "Good Reason," as defined in Exhibit B, those options outstanding that are not yet exercisable and vested as of the date of said Change in Control, shall become fully exercisable and vested ("Change in Control Provision");

RESOLVED, that each such option shall vest in one-fourth increments on each of the first through fourth anniversaries of the grant date and shall be subject in all respects to the provisions of the 1998 Plan and the prior determinations of this Committee with respect to such 1998 Plan; provided that no such option shall be effective if the appropriate officers determine prior to delivery of the appropriate option grant document, that effecting the grant of such

APPLEBRB0003566
CONFIDENTIAL

option was made in error, is inadvisable or otherwise not in the best interests of the Corporation and its shareholders;

REDACTED

APPLEBRB0003567
CONFIDENTIAL

This Consent may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument, and is executed as of the date first set forth above.

| | |
|---|---|
| Gareth C.C. Chang | Steven P. Jobs |
| William V. Campbell | Jerome B. York |
| Millard S. Drexler | Arthur Levinson |
| Lawrence J. Ellison | |

APPLEBRB0003568
CONFIDENTIAL

This Consent may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument, and is executed as of the date first set forth above.

_____
Gareth C.C. Chang

_____
William V. Campbell

_____
Millard S. Drexler

_____
Lawrence J. Ellison

_____
Steven P. Jobs

_____
Jerome B. York

_____
Arthur Levinson

APPLEBRB0003569
CONFIDENTIAL

This Consent may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument, and is executed as of the date first set forth above.

_____
Gareth C.C. Chang

_____
Steven P. Jobs

_____
William V. Campbell

_____
Jerome B. York

_____
Millard S. Drexler

_____
Arthur Levinson

_____
Lawrence J. Ellison

APPLEBRB0003570
CONFIDENTIAL

This Consent may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument, and is executed as of the date first set forth above.

| | |
|---|---|
| _____ | _____ |
| Gareth C.C. Chang | Steven P. Jobs |
| | |
| _____ | _____ |
| William V. Campbell | Jerome B. York |
| | |
| _____ | _____ |
| Millard S. Drexler | Arthur Levinson |

_____
Lawrence J. Ellison

APPLEBRB0003571
CONFIDENTIAL

This Consent may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument, and is executed as of the date first set forth above.

_____
Gareth C.C. Chang

_____
Steven P. Jobs


_____
William V. Campbell

_____
Jerome B. York


_____
Millard S. Drexler

_____
Arthur Levinson


_____
Lawrence J. Ellison

APPLEBRB0003572
CONFIDENTIAL

This Consent may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument, and is executed as of the date first set forth above.

Gareth C.C. Chang

Steven P. Jobs

William V. Campbell

Jerome B. York

Millard S. Drexler

Arthur Levinson

Lawrence J. Ellison

APPLEBRB0003573
CONFIDENTIAL

This Consent may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument, and is executed as of the date first set forth above.

| | |
|---|---|
| _____ | _____ |
| Gareth C.C. Chang | Steven P. Jobs |
| | |
| _____ | _____ |
| William V. Campbell | Jerome B. York |
| | |
| _____ | _____ |
| Millard S. Drexler | Arthur Levinson |
| | |
| _____ | |
| Lawrence J. Ellison | |

APPLEBRB0003574
CONFIDENTIAL

Exhibit A

# 1998 Executive Officer Stock Plan

Stock recomendations for January 17, 2001

| | Stock Recommendation | Vesting |
|---|---|---|
| Fred Anderson | 1,000,000 | Annual over 4 years |
| Tim Cook | 1,000,000 | Annual over 4 years |
| Jon Rubinstein | 1,000,000 | Annual over 4 years |
| Avie Tevanian | 1,000,000 | Annual over 4 years |
| Nancy Heinen | 400,000 | Annual over 4 years |
| Sina Tamaddon | 400,000 | Annual over 4 years |
| Total Recommended | 4,800,000 | |

APPLEBRB0003575
CONFIDENTIAL

*Exhibit B*

*"Change in Control"* means the happening of any of the following:

(i)     When any "person", as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, a Subsidiary or a Company employee benefit plan, including any trustee of such plan acting as trustee) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities; or

(ii)     The occurrence of a transaction requiring shareholder approval, and involving the sale of all or substantially all of the assets of the Company or the merger of the Company with or into another corporation.

*"Cause"* shall mean a termination of your employment which is a result of (i) your felony conviction, (ii) your willful disclosure of material trade secrets or other material confidential information related to the business of the Corporation and its subsidiaries or (iii) your refusal or failure to perform your duties with the Corporation (other than any such failure resulting from your incapacity due to physical or mental illness) or to comply with the reasonable directions received from or policies established by the Corporation, the CEO, or the Board of Directors or (iv) any act or omission that is the result of willful misconduct or gross negligence and that, in the good faith opinion of the Corporation, is injurious in any material respect to the financial condition, business or reputation of the Corporation.

*"Good Reason"* shall mean a resignation of your employment as a result of any of the following:

(i)     A substantial diminution in your position or duties, or an adverse change to your title as in effect immediately prior to the Change in Control;

(ii)     A reduction by the Corporation in your annual base salary in effect immediately prior to the Change in Control, or the failure to pay your salary when due;

(iii)     The relocation of the office of the Corporation where you are employed as of the Change in Control (the "Employment Location") to a location which is more than seventy-five (75) miles away from the Employment Location or the Corporation is requiring you to be based more than seventy-five (75) miles away from the Employment Location (except for required travel on the Corporation's business to an extent substantially consistent with your customary business travel obligations in the ordinary course of business);

which, in any case is not remedied within thirty (30) days after receipt of written notice from you to the Corporation, specifically delineating each such act and setting forth your intentions to resign if such breach is not duly remedied, provided, that if the specified breach cannot be remedied within said thirty (30)-day period and the Corporation commences reasonable steps within said thirty (30)-day period to remedy such breach and diligently continues such steps thereafter until a remedy is effected, such breach shall not constitute "Good Reason."

APPLEBRB0003576
CONFIDENTIAL

Exhibit C

REDACTED

Apple Confidential - Need to Know

Bonus Plan Proposal

2/14/01

APPLEBRB0003577
CONFIDENTIAL

# EXHIBIT 21
## LODGED UNDER SEAL

# EXHIBIT 22

Board of Directors
October 19, 2001

APPLEBRB0003793
CONFIDENTIAL

MINUTES OF A MEETING OF
THE BOARD OF DIRECTORS OF
APPLE COMPUTER, INC.
October 19, 2001

Pursuant to notice duly given, the Board of Directors of Apple Computer, Inc. (the "Board") held a special meeting of the Board on October 19, 2001, by telephone conference.

Present at the commencement of the meeting were the following directors of the Corporation:

William V. Campbell
Millard S. Drexler
Lawrence J. Ellison
Arthur D. Levinson
Jerome B. York

Also present for all or a portion of the meeting by invitation of the Board was Nancy R. Heinen, Senior Vice President, General Counsel and Secretary of the Corporation.

Mr. Levinson chaired the meeting and Ms. Heinen kept the minutes. All of the participants indicated that they could hear one another. A quorum being present, the chairman called the meeting to order.

*CEO Compensation*

Mr. Levinson advised the Board that as discussed at the August 29, 2001 Board meeting, the Compensation Committee had met and considered several proposals for awarding compensation to Steven P. Jobs, Chief Executive Officer of the Corporation, as recognition for the contributions he has provided to date and to provide him with an incentive to remain with and continue to contribute to the Corporation. Mr. Jobs receives a salary of $1 a year for his services as CEO and while he has a significant number of vested options, all of his options are underwater. Mr. Levinson reviewed with the Board the various proposals considered by the Compensation Committee including granting options to purchase shares of the Company's common stock and the vesting of such options. Mr. Levinson further advised the Board that for tax deductibility purposes under Section 162(m) of the Internal Revenue Code, such compensation award should be approved by a majority of the outside directors as defined in the Internal Revenue Code. Accordingly, both Mr. Campbell and Mr. York who are not deemed "outside directors" for Section 162(m) deductibility purposes, should abstain from voting on any compensation awarded to Mr. Jobs.

The Board then discussed various tax, legal, accounting, publicity and other issues associated with the various proposals. Thereafter, upon motion duly made and seconded, the Board, excluding Mr. Campbell and Mr. York who abstained, approved the following:

APPLEBRB0003794
CONFIDENTIAL

RESOLVED, Steven P. Jobs, Chief Executive officer, is hereby granted an option under the 1998 Executive Officer Stock Plan (the "1998 Plan") to acquire 7,500,000 of shares of Common Stock at an exercise price equal to the closing price for the Corporation's Common Stock on the date of grant;

RESOLVED, that 25% of such option shall be vested as of the date of grant and the remaining shares shall vest in three equal annual installments and shall become exercisable on each annual anniversary thereafter;

RESOLVED, that such option shall be subject in all respects to the provisions of the 1998 Plan, and the prior determinations of the Board with respect to such plan; provided, that no such option shall be effective if the Board determines prior to delivery of the appropriate option grant document, that effecting the grant of such option was made in error, is inadvisable or otherwise not in the best interests of the Corporation and its shareholders;

RESOLVED, that such option shall contain a provision which provides that in the event of a Change in Control, as defined in Exhibit A attached hereto, and if in connection with or following such Change in Control, his employment is terminated other than for "Cause" or if he should resign for "Good Reason," as defined in Exhibit A, those options outstanding that are not yet exercisable and vested as of the date of said Change in Control, shall become fully exercisable and vested ("Change in Control Provision");

RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, for and in the name and on behalf of the Corporation, to execute and deliver any and all certificates, agreement, and other documents, take any and all steps and do any and all things which they may deem necessary or advisable in order to effectuate the purposes and intent of each and all of the forgoing resolutions;

RESOLVED, that any actions taken by any of the officers on or prior to the date of the foregoing resolutions that are within the authority conferred hereby, are hereby ratified, confirmed and approved as the act and deed of the Corporation.

There being no further business, the meeting was duly adjourned.

Nancy R. Heinen
Secretary

APPLEBRB0003795
CONFIDENTIAL

Exhibit A

"*Cause*" shall mean a termination of your employment which is a result of (i) your felony conviction, (ii) your willful disclosure of material trade secrets or other material confidential information related to the business of the Corporation and its subsidiaries or (iii) your refusal or failure to perform your duties with the Corporation (other than any such failure resulting from your incapacity due to physical or mental illness) or to comply with the reasonable directions received from or policies established by the Corporation, the CEO, or the Board of Directors or (iv) any act or omission that is the result of willful misconduct or gross negligence and that, in the good faith opinion of the Corporation, is injurious in any material respect to the financial condition, business or reputation of the Corporation.

"*Good Reason*" shall mean a resignation of your employment as a result of any of the following:

> (i).      A substantial diminution in your position or duties, or an adverse change to your title as of the effective date of your employment;

> (ii)      A reduction by the Corporation in your annual base salary as of the effective date of your employment or the failure to pay your salary when due;

> (iii)      The relocation of the office of the Corporation where you are employed as of the effective date of your employment to a location (the "Employment Location") which is more than seventy-five (75) miles away from the Employment Location or the Corporation is requiring you to be based more than seventy-five (75) miles away from the Employment Location (except for required travel on the Corporation's business to an extent substantially consistent with your customary business travel obligations in the ordinary course of business);

which, in any case is not remedied within thirty (30) days after receipt of written notice from you to the Corporation, specifically delineating each such act and setting forth your intentions to resign if such breach is not duly remedied, provided, that if the specified breach cannot be remedied within said thirty (30)-day period and the Corporation commences reasonable steps within said thirty (30)-day period to remedy such breach and diligently continues such steps thereafter until a remedy is effected, such breach shall not constitute "Good Reason."

APPLEBRB0003796
CONFIDENTIAL

# EXHIBIT 23
## LODGED UNDER SEAL

# EXHIBIT 24

Compensation Committee
November 13, 2001

APPLEBRB0003828
CONFIDENTIAL

MINUTES OF A MEETING OF
THE COMPENSATION COMMITTEE OF
THE BOARD OF DIRECTORS OF
APPLE COMPUTER, INC.
November 13, 2001

Pursuant to notice duly given, the Compensation Committee of the Board of Directors of Apple Computer, Inc. held a regular meeting on November 13, 2001, commencing at 8:55 a.m. local time.

Present during the meeting were committee members William V. Campbell, Arthur D. Levinson, and Jerome B. York.  Also present at the invitation of the Committee were Nancy R. Heinen, Senior Vice President, General Counsel and Secretary and Fred Anderson, Executive Vice President and CFO of the Corporation. Also present was Mr. Drexler, member of the Board of Directors.

Mr. Levinson chaired the meeting and Ms. Heinen kept the minutes. A quorum being present, the chairman called the meeting to order.

*Prior Minutes*

The first order of business was the Committee's approval of minutes of its prior meetings. Following discussion, and upon motion duly made and seconded, it was unanimously:

RESOLVED, that the minutes of the following meetings of this Committee, as written and presented to this Committee, are hereby ratified and approved:

| Date | Minutes |
|---|---|
| October 16, 2001 | Compensation Committee |
| October 19, 2001 | Compensation Committee |

*1998 Executive Officer Stock Plan*

The Committee next reviewed in detail the dilution analysis materials provided in advance of the meeting. The Committee discussed in detail the dilution calculation and the increase in dilution rate represented by the proposed increase in the number of shares available for issuance under the 1998 Executive Officer Stock Plan. Following discussion, the Committee agreed to recommend to the full Board that the Corporation seek approval from its shareholders to increase by five million the number of shares available for grant under the 1998 Executive Officer Stock Plan.

There being no further business, the meeting was adjourned at 9:40 a.m.

Nancy R. Heinen
Secretary

APPLEBRB0003829
CONFIDENTIAL